IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL MEER,                          )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )    No. 07 C 1058
                                       )
BRUCE GRAHAM, SYLVIA MANNING,          )
MICHAEL TANNER, GENE SBALCHIERO, and   )
THE BOARD OF TRUSTEES OF THE           )
UNIVERSITY OF ILLINOIS,                )
                                       )
          Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Michael Meer's amended complaint ("complaint") seeks a petition for mandamus, declaratory judgment, and injunctive relief (counts I-III, respectively), alleges violations of procedural due process, substantive due process, and equal protection under 42 U.S.C. § 1983 (counts IV-VI, respectively), and alleges retaliatory discharge (count VII); and, in the alternative, seeks a petition for mandamus, declaratory judgment, and injunctive relief for "[t]ermination of [c]ontract" (counts VIII-X, respectively) and alleges violations of procedural due process, substantive due process, and equal protection under § 1983 (counts XI-XIII, respectively). Defendants Bruce Graham ("Graham"), Sylvia Manning ("Manning"), R. Michael Tanner ("Tanner"), Gene Sbalchiero ("Sbalchiero") (collectively, "individual defendants"), and the Board of Trustees for the University of Illinois ("Board") have

moved for summary judgment on all claims.[1]  Plaintiff has cross-moved for summary judgment on counts I and III through VII.  For the following reasons, defendants' motion for summary judgment on all counts is granted, and plaintiff's cross-motion for summary judgment on counts I and III through VII is denied.

I.

Meer is a former employee of the University of Illinois at Chicago ("UIC").  The Board governs the University of Illinois' three campuses, including UIC.  Manning was Chancellor of UIC.  Tanner is Provost of UIC.  Graham is Dean of UIC's College of Dentistry ("COD").  Prior to September 14, 2006, Meer held the non-tenured positions of Clinic Chief and Director of the Post-Graduate Program ("Program Director") in the Oral and Maxillofacial Surgery ("OMFS") Department as well as Clinical Assistant Professor in UIC's COD.

Meer received annual appointments effective in August.  The annual notifications of appointment are generated by the university's human resources department.  Meer's appointed

---

[1]Count I is against all defendants; count II is against the individual defendants in their individual capacities; count III is against the Board and the individual defendants in their official capacities; counts IV through VII are against the individual defendants in their individual capacities; count VIII is against all defendants; counts IX and X are against the Board and the individual defendants in their official capacities; and counts XI through XIII are against the individual defendants in their individual capacities. *Meer v. Graham*, 524 F. Supp. 2d 1044, 1056-57 (N.D. Ill. 2007).

positions for August 16, 2006 through August 15, 2007 were Clinic Chief and Clinical Assistant Professor.[2]  Graham attested that Meer's title of "Director of Post-Graduate Program in Oral Maxillofacial Surgery" is "a College of Dentistry bestowed title."[3]

Meer's appointment as Clinic Chief for August 16, 2006 through August 15, 2007 was not a full-time appointment.  Meer testified that, "[a]s far as I know[,]" the Clinic Chief appointment was academic professional.  Graham attested that "Acad/Pro" on the notification of appointment form referred to Meer's "'academic professional' appointment."  Meer's appointment as Clinical Assistant Professor for August 16, 2006 through August 15, 2007 was a 100% full-time appointment.  Meer testified that it was "[c]orrect" that his understanding is that the clinical professor appointment was academic.  Graham attested that "Acad 12 Mth" on the notification of appointment form referred to Meer's "'academic' appointment."  When asked how his time was divided between the clinical assistant professor and program director duties, Meer "guesstimat[ed]" "maybe 60 percent clinical assistant professor, 40

---

[2]The notification of appointment form lists "CLIN ASST PROF" as "Title" and "Acad 12mth" as "Employee Class/Service Basis" as well as "CLIN CHIEF" as "Title" and "Acad/Pro 12mth" as "Employee Class/Service Basis."

[3]Plaintiff "denies that his title was 'college bestowed[,]'" but fails to cite any record support.

percent program director."[4]

Graham testified that Meer had "a faculty appointment as a clinical assistant professor at . . . 100% time[]" and "a program director-clinic chief role that's defined as zero percent commitment and there is a stipend attached to that." Graham further testified that "the university uses that method to be able to compensate program directors for their administrative responsibilities separate from their - basically that's all one role, but this allows us to pay someone who has that responsibility a little more than if we were just trying to pay them as a clinical professor." Meer participated in the "Dental Service Plan" ("DSP"), which is governed by its own bylaws. Under the DSP, Meer could earn additional income for performing certain dental surgeries. There is no provision in the DSP bylaws that reflects that participants can use residents to perform surgeries; services performed by residents do not generate income for participants.

In 2006 and 2007, Meer was neither tenured nor received probationary credit toward tenure. Graham attested that, during 2006 and 2007, Meer "did not hold an appointment as an administrative staff member."[5] Meer also did not hold any title as a dean or director of Endodontics, Oral Biology, OMFS, Oral

---

[4]Plaintiff testified that he "assume[d]" Clinic Chief and Program Director were synonymous.

[5]Plaintiff "denies that he was not an administrative staff member[,]" but fails to cite any record support.

4

Medicine and Diagnostic Sciences, Orthodontics, Pediatric Dentistry, Periodontics, Restorative Dentistry, or the Center for Molecular Biology of Oral Diseases. Graham attested that the only director in the COD is the Director of the Center for Molecular Biology of Oral Diseases, and Graham is the only dean in the COD.[6]

The Program Director was "most directly responsible for the operations of the program[,]" which would include "[t]he education, the patient care rendered by the residents, the education of the residents, the academic progress through the program of the residents, the supervision by attending of the residents, appropriate supervision, outcome of the program, evaluation of the residents and their performance . . . . " As Program Director and Clinical Assistant Professor, Meer reported to the OMFS Department Head, Dr. Leslie Heffez ("Heffez"). Meer testified that, as Program Director, his responsibilities were "to oversee with Dr. Heffez the educational activities that were going on and within the [OMFS] department[.]" Meer testified that he was responsible for the "educational aspects[,]" meaning "scheduling the courses, teaching, arranging for course feedback on the rotations on the courses, on what's going on in the clinic on a daily basis[,]" and Heffez was responsible for "the rest[.]" The UIC COD website for "Oral and Maxillofacial Surgery 2008-09" states

_____

[6]Plaintiff "denies these allegations[,]" but fails to cite any record support.

5

> The Advanced Educational Program in Oral and
> Maxillofacial Surgery at the University of Illinois at
> Chicago is a 48 month (4 year), postdoctoral program
> accredited by the Commission on Dental Accreditation of
> the American Dental Association. The last site
> accreditation visit occurred in October 2007.

In 2006, there were twelve oral surgery residents (also referred to as post-graduate residents) in the OMFS residency program. Meer also taught some of the COD's approximately 300 pre-doctoral and international students.

"The educational policy, organization, and governance" of the University of Illinois are promulgated in the "University Statutes" ("Statutes"). Article II, § 3a of the Statutes provides

> (1)
> The faculty of the University and any of its units except
> for the Graduate College consists of those members of the
> academic staff with the rank or title in that unit of
> professor, associate professor, or assistant professor
> who are tenured or receiving probationary credit toward
> tenure, and those administrators in the direct line of
> responsibility for academic affairs (persons who hold the
> title director or dean in an academic unit, provost,
> chancellor and president). Administrative staff members
> not in the direct line of responsibility for academic
> affairs are members of the faculty only if they also hold
> faculty appointments. The bylaws of any academic unit
> may further mandate a minimum percent faculty appointment
> in that unit for specified faculty privileges, such as
> voting privileges.
>
> (2)
> The bylaws of a unit may grant specified faculty
> privileges to selected faculty of other units. The
> bylaws may also grant specified faculty privileges to
> members of the academic staff of the unit or of other
> units who are not included in subsection 1 above (i.e.,
> neither tenured nor receiving probationary credit toward
> tenure), and who have the rank or title of professor,
> associate professor, assistant professor, instructor, or
> lecturer. The bylaws may also grant specified faculty

privileges to members of the academic staff of the unit or of other units who have the rank or title of professor, associate professor, assistant professor, instructor, or lecturer modified by the terms "research," "adjunct," "clinical," "visiting," and/or "emeritus" (e.g., "research professor," "adjunct assistant professor," "clinical associate professor," "visiting professor"). Only academic staff with titles listed above may be extended faculty privileges. Voting on these provisions of the bylaws is limited to those named in subsection 1 above.

Article III, § 2a of the Statutes states that, "The college is an educational and administrative group comprised of departments and other units with common educational interests." Article III, § 2b of the Statutes states that

The faculty of a college shall be constituted as specified in Article II, Section 3a(1). The college shall be governed in its internal administration by its faculty under bylaws established by the faculty, as specified in Article II, Section 3b.

Article III, § 4a provides that, "In addition to colleges and departments, there may be other units of a campus, such as a school, institute, center, hospital, and laboratory, of an intermediate character designed to meet particular needs." Article III, § 4c states that

The school organized within a college is an educational and administrative unit composed primarily of academic subunits. The subunits are related and have common interests and objectives but emphasize academically distinct disciplines or functions . . . .

Article IV, § 3a of the Statutes states

The head of a department shall be appointed without specified term by the Board of Trustees on recommendation by the chancellor and the president after consultation with the dean of the college and all members of the

7

department faculty.  The head may be relieved of title and duties as head of the department by the chancellor on the recommendation of the dean of the college.  The performance of the head shall be evaluated at least once every five years.  As one component of this evaluation, views shall be solicited from the entire department faculty.

Article IX, § 6a of the Statutes provides

Severe sanctions other than dismissal for cause may be imposed on a member of the faculty, as defined in Article II, Section 3a(1) of the *Statutes*, provided that procedures on a campus adopted by the campus chancellor in consultation with that campus senate are followed.  In all cases, the chancellor or the chancellor's designee shall exercise the duties assigned to the president for academic staff who are members of campus units, and in all cases the process to be followed will be that of the campus on which the unit resides.

Article IX, § 6b lists the "minimum" "[c]ampus procedures[,]" stating that they "are the exclusive process for determining whether severe sanctions other than dismissal for cause may be imposed."  Article IX, § 6c states, in part, that "The campus procedures will be initiated only after discussions are held between the faculty member and appropriate administrative officers looking toward a mutual settlement."  Article IX, § 6d limits "[a]dequate due cause for severe sanctions other than dismissal" to specified actions.  Article IX, § 6e of the Statutes states that, "When misconduct is determined to have occurred, a severe sanction other than dismissal consists of suspension with or without salary (full or partial) for a period not to exceed one-half of the individual's normal appointment period . . . . "

The COD "Faculty Bylaws" ("Bylaws")

8

describe methods of implementation of Article III, Section 2, Paragraph 2b of the *Statutes* of the University of Illinois within the College of Dentistry. That paragraph states "..the college shall be governed in its internal administration by its faculty under *Bylaws* established by the faculty." Nothing in these *Bylaws* shall be interpreted as contravening actions of the Board of Trustees of the University or the *Statutes* of the University . . . .

Article III of the Bylaws provides that "[t]he College shall be governed in its internal administration by the following, referred to, for the purpose of these *Bylaws*, as Faculty:"

Those members of the academic staff of the College with the unmodified or modified rank or title of professor, associate professor, assistant professor, or instructor who are tenured or receiving probationary credit toward tenure; and

Those members of the academic staff of the College with the unmodified or modified rank or title of professor, associate professor, assistant professor, or instructor who are not tenured or receiving probationary credit toward tenure and who hold a salaried appointment of at least 20% time in the College; and

Those administrators in the direct line of responsibility for academic affairs (Dean of the College, Vice Chancellor for Academic Affairs, Chancellor, and President). Administrative staff who are not in the direct line of responsibility for academic affairs are members of the Faculty only if they also hold academic staff appointments as described above.

The following are not included in the Faculty of the College: Lecturers; Research, Teaching, and Clinical Associates; Research, Teaching, and Clinical Assistants; Research Specialists; Academic Professionals.

Article V of the Bylaws identifies the "Academic Units of the College" as follows

*Departments*
        Endodontics

Oral Biology
          Oral and Maxillofacial Surgery
          Oral Medicine and Diagnostic Sciences
          Orthodontics
          Pediatric Dentistry
          Periodontics
          Restorative Dentistry
     *Center(s):*
          Center for Molecular Biology of Oral Diseases

     Article IX, § 11b(1) of the Statutes states, in relevant part,

that written notice of nonreappointment shall be given "to the

full-time academic professional staff,"[7] at least six months prior

for full-time service of less than four years and at least twelve

months prior for full-time service of four years or more.  Article

X, § 1a(4) of the Statutes states that appointments "with the rank

of clinical assistant, research assistant, or teaching assistant

shall be for not longer than one year and notice of

nonreappointment is not required."  The "Faculty Handbook"[8] states,

in part, that "notice of nonreappointment is not required in the

case of any appointment at the rank of instructor or lecturer, or

for any appointment that includes in the title the term 'adjunct,'

'clinical', or 'visiting.'"  A February 5, 2007 memo from

Mrinalini Rao ("Rao"), the Vice Provost of Faculty Affairs,

regarding "Policies/Procedures for Notices of Non-reappointment to

Tenure-Track and Non-Tenured Faculty" also indicates that notice of

_____

     [7]Article IX, § 11b provides that the full-time academic
professional staff is defined in Article II, Section 5.

     [8]Only a portion of the document is attached, and the parties
do not specify if this document applies to the UIC or the COD.

10

non-reappointment is not required for positions where the titles include the term clinical.

After receiving a July 25, 2006 e-mail from Meer advising the residents that housing would no longer be covered as a cost for those attending a rotation in Canada, several residents met to discuss their lack of surgical experience, including the loss of surgical opportunities related to the Canada rotation. A letter dated July 28, 2006 ("July 28 letter") to Meer from twelve residents addresses "the Canada rotation and the unilateral decision to make residents responsible for room and board." The July 28 letter states that the situation is "untenable and that as a required rotation in this program, the Department and/or Interface should be, at minimum, responsible for our places of residence." Dr. Jason Edwards ("Edwards"), a resident, testified that, once the July 28 letter was sent, morale dropped and hostility escalated. Edwards also testified that Heffez threatened that if he did not do the rotation he could be kicked out or would not advance in the program, and Heffez instructed him to coerce other residents to do the rotation. Edwards testified that he delayed his response to Heffez "such that it could buy us time to submit the formal complaint, and then later I accepted the invitation to electively attend the rotation, after which time I called the residents['] hotline and told GME, Department of Graduate and Medical Education, that we felt undue pressure was

being put on us as surgical residents, and we formulated a letter to file a complaint or we started to have discussions regarding a formal complaint."

On September 5, 2006, Graham, the Dean of the COD, reviewed a letter dated August 28, 2006 ("August 28 letter") which was signed by five OMFS residents. The letter complained of a work environment of intimidation, coercion and threats, and a concern over whether the residents would be afforded fair process because of the involvement of the program director and the program head. The letter reflected that copies were sent to the UIC Office of Graduate Medical Education ("GME") as well as the American Dental Association Commission on Dental Accreditation. Graham testified that he met with the director of the Office of the GME on or around September 7, "and at that point in time she had not received this letter." Edwards testified that the letter was a collective effort by the residents, which was their "cry for help." Dr. Tarkan Sidal ("Sidal"), a resident testified that "we made our complaint, and again we said we want a reasonable training environment, however that can be done."

According to the August 28 letter, the residents' complaints were "long standing," and "the intensity of constant intimidation increased since July 28, 2006 when the resident staff unanimously

protested a unilateral change regarding the Canada rotation."[9]  The
August 28 letter stated that the residents were "concerned about
job security or additional punitive measures[,]" and they felt "at
risk for retaliation by the department for submitting these
complaints."  The August 28 letter lists "[i]ntimidation in for the
form of:"

> -frequent verbal insults which contribute to a hostile
> environment
> -repeated threats of dismissal
> -unrestrained use of probationary status (at least 75% of
> the resident staff has been on probation)
> -informal use of probation
> -inappropriate personal remarks made to residents
> -coercion and misleading statements regarding an
> "elective" rotation to Canada

Graham testified that he had never previously seen complaints "to
this extent."

On September 9, 2006 ("September 9 meeting"), Graham and Dr.
Frank Licari ("Licari"), the Executive Associate Dean for Academic
Affairs in the COD, met with five of the twelve OMFS residents at
a campus location away from the OMFS Department.  Graham had
consulted with UIC counsel and UIC's Office of Access and Equity
before meeting with the residents.  The five residents at this
meeting were Drs. Hollar, Oana, Lukasavage, Nguyen, and Tillner.
During the meeting, Graham and Licari each took notes.

Graham attested that, as reflected in his notes, the

_____

[9]Plaintiff "admits the allegations . . . only to the extent
that the letter contained the complaints and not for the truth of
the matters asserted therein."

residents' complaints during the September 9 meeting were as follows: the OMFS program was a hostile environment; Heffez humiliates residents; "Heffez called residents 'lazy;'" Heffez told Tillner that Heffez would quit the profession if Tillner became an OMFS surgeon and Tillner was an embarrassment to the profession; when Oana told Heffez that Oana would send a letter complaining about another dentist, "Heffez commented that he might find 'some things about you that would result in your [Dr. Oana's] dismissal;'" residents leave the room in tears after performance evaluations, and "Heffez would do all the talking" in Meer's presence; the residents have no confidence in Meer; Heffez forced the residents to contact medical supplier representatives to solicit donations for a department party; a surgical rotation in Canada that was designated as an elective was not really elective; the residents criticized Meer's role in only acting as the attending surgeon on simple tooth extractions and basic procedures rather than more complex surgeries that could assist them in learning advanced oral surgery; and, on August 31 and September 2, 2006, Heffez verbally threatened some of the residents that if they did not attend the Canada rotation, they would not advance to their senior year.

Graham further attested that the residents' complaints during the September 9 meeting also included: Nguyen stated that he was afraid to discuss or say no to attending the Canada rotation

14

because he feared being placed on academic probation; Heffez was accused of using verbal and psychological abuse toward the residents; Nguyen stated that "Heffez asked him 'did you take your brain here to work with?'" and that Heffez hit residents under the operating room drapes and with instruments; the residents were afraid of Heffez, and Heffez referred to one of them "as a 'baboso,' meaning someone who is stupid, an animal;" Heffez screamed at the residents, and "had referred to residents as a pig, an animal, brainless, stupid, greedy, lazy, selfish and infants;" Heffez told Tillner that one of Tillner's notes "'seemed like an infant wrote it;'" Heffez frequently yelled and pulled on the residents' hands while they were performing retractions in surgery; Hollar reported that Heffez had stabbed Hollar carelessly with a gauze packer and that Heffez called Oana stupid; the residents complained about having minimal hands on experience as surgeons; and all the residents have been asked to do research while on vacation, and they were afraid to take sick leave even when vomiting.

In September 2006, Heffez approached Sidal in the COD parking lot and told Sidal that, if he did not attend the Canada rotation, then he would not advance to his fourth year. Sidal did not attend the Canada rotation. Sidal was humiliated by Heffez in June 2006 when Heffez referred to him as an "obedient dog" in front of his colleagues and attending surgeons. Sidal testified that the August

15

28 letter said that the residents did not want the program director and the program head involved because the residents were "scared" because Heffez was not "approachable" and "he was making all the decisions" and Meer "would not object to him." Edwards also testified that Heffez and Meer were "unapproachable."[10] When asked about what he did in response to some unspecified complaints ane whether he went to Heffez to say the residents were complaining, Sbalchiero testified that he did not and that Heffez "was a man you didn't go to."

Graham testified that it is "a fair characterization" to say that Heffez was the main subject of the residents' complaints during the September 9 meeting. Graham also testified that it "would be fair to say" that the residents' main complaint about Meer was that Meer sat and watched Heffez abuse them. Graham testified that Tillner, Oana, and Hollar related that Heffez berated them in their six-month evaluations and Meer said nothing. Graham attested that the residents reported that Meer was present for a number of incidents involving Heffez's conduct, but took no action to prevent or stop it. Licari likewise attested that the residents stated that Meer was present during a number of the

_____

[10]Plaintiff claims that Edwards never attempted to approach him. In the portion of Edwards' deposition that plaintiff attached, Edwards was asked whether he ever aired some unspecified grievance with plaintiff. Edwards testified that "I never felt comfortable . . . airing any grievance with any of my faculty members." When then asked if he never approached plaintiff about the unspecified grievance, Edwards answered "I did not."

incidents where the residents accused Heffez of making inappropriate comments, but Meer did not intercede or take any steps to prevent or stop Heffez's actions.

Graham testified that the residents were concerned about "what they considered to be an excessive work load." Graham further testified that they had been told by Meer "that the program did not need to conform to the UIC Graduate Medical Education policies on 80-hour work week." Graham also testified that the residents made "other comments" about Meer and "the kinds of surgery he would supervise." Graham further testified that Tillner recounted an incident about Meer "altering the patient record to remove mention of his involvement in it[;]" Graham did not ever confirm whether that was true. Graham also testified that he did not ever confirm whether the residents' concern about Meer's willingness to supervise major surgeries was true.

Graham testified that, after the September 9 meeting, he and Licari "agreed that what we had heard indicated – at this point in time, indicated to us, a very dysfunctional learning environment." Licari testified that, over the course of the meeting, "it became pretty compelling to us that this was a major problem that we had within the department of oral surgery at this time."

Licari attested that, before the September 9 meeting, he reviewed the August 28 letter alleging excessive use of probation in the OMFS residency program. Licari attested that the practice

in the COD would be that either Licari or Graham would be advised on any residents being placed on probation. Licari also attested that, before September 14, 2006, Licari was not advised of any current resident other than Oana being placed on probation.

On September 12, 2006, Graham met with Steve Holz, legal counsel. On September 13, 2006 ("September 13 meeting"), Graham and Licari met with Edwards and Lukasavage in the same location as the September 9 meeting. Edwards had not attended the September 9 meeting. Graham and Licari each took notes during this meeting. Graham and Licari attested that Edwards stated that Heffez had made threats of dismissal to the residents and had referred to them as monkeys, pigs, idiots, and stupid. Graham and Licari attested that Edwards stated that residents would be put on probation for as long as forty weeks. Graham testified that his notes indicate that Edwards was told by doctors "H" and "M" - "Doctor M means Meer" - "to bill every extraction as surgical, because IDPA doesn't pay enough, close quotes."[11]

Graham and Licari attested that Edwards stated that Heffez "would 'go after'" Sidal about attending the Canada surgical rotation. Graham and Licari attested that Edwards advised them

---

[11]Plaintiff "admits this allegation only to the extent that Edwards made this allegation in the September 13 meeting and that no allegation is made that Defendants ever attempted to ascertain the truth of this assertion from either Heffez or Meer." Plaintiff further "affirmatively denies the truth of the underlying allegation."

that Heffez told Edwards that Edwards was making a "big mistake" if he did not attend the Canada rotation and he would not advance to become a senior resident if he did not attend.  Graham and Licari also attested that Edwards complained about the residents not getting enough experience performing surgeries.  Graham attested that Edwards stated that the most important issue to the residents was the lack of clinical and surgical exposure; Licari attested that Edwards related that the most important issue to him was the lack of clinical procedure exposure.

Graham and Licari also attested that Edwards stated that Heffez had struck him on the hand with an osteotome.  Edwards testified that Heffez struck him with an osteotome, which is a bone chisel, cutting his glove, and that Heffez "told me, 'if you're not smart enough to get out of my way, I'm not sorry for striking or hitting you' or something to that effect."  Graham and Licari also attested that Edwards stated that Heffez had called a former chief resident, Dr. Diaz, a pig on a number of occasions.

Graham and Licari also attested that Edwards stated that he had fallen asleep while driving, causing an accident, after being on-call for thirty-six hours.  Edwards testified that, in the summer of 2004, "after taking multiple calls at Mercy Hospital[,]" which meant he "was up all night for several days straight[,]" he "fell asleep driving[]" and got hit "by a delivery truck."  Graham and Licari further attested that Edwards commented that Meer was

timid and took too long to perform surgeries.

Prior to September 14, 2006, some residents had provided Graham copies of e-mails reflecting certain concerns, including: residents being placed on probation by e-mail; residents' impressions of Heffez's influence on attending the Canada rotation; Heffez directing residents to be aggressive in obtaining donations for a party; and Edwards getting into a car accident after thirty-six hours on call. Graham also received an e-mail from Nguyen expressing his concerns about the residency program and his fear of Heffez.

Graham attested that, based on the August 28 letter, his interviews of Lukasavage, Edwards, Hollar, Oana, and Tillner, and documents provided by the residents, he believed that the OMFS teaching environment was hostile, dysfunctional, and not conducive to a proper education program. On September 14, 2006, Graham called Manning, who assented to removing Heffez and Meer from their supervisory duties. On September 14, 2006, Graham then advised Meer that he was being temporarily removed from his duties and responsibilities as Program Director, but he would continue to be paid for that position. Sbalchiero did not participate in that decision. The same day, Graham also advised Heffez that he was being temporarily removed from his position as Department Head, with pay.

Meer continued in his position as a Clinical Assistant

Professor in the COD until August 15, 2007. Even though he had been removed from his duties as Program Director, Meer continued to receive pay for both the Clinical Assistant Professor and Program Director positions through August 15, 2007. Meer's DSP income increased after September 14, 2006, when his contact with residents was restricted. Meer's counsel wrote a letter addressed to Graham dated September 29, 2006 regarding Meer's temporary removal, stating that he was improperly removed under the GME Policies and the Statutes. Holz sent Meer's counsel a letter dated October 17, 2006, stating that "no proceedings for sanction ha[d] been initiated[.]" Meer's counsel also wrote letters addressed to Holz dated October 26, November 8, November 30, and December 4, 2006 regarding the investigation.

Graham appointed Sbalchiero as Acting Department Head and Acting Program Director. On or about September 18, 2006, Sbalchiero and Graham agreed that the OMFS residents would be reassigned from Meer and Heffez for purposes of any teaching functions. Meer was not restricted from teaching, research, or service except with the OMFS residents. Meer was free to continue teaching, research, and service with respect to the majority of students within the COD.

Graham consulted with Patricia Gill, UIC's Director of the Office of Access and Equity, and Rao about further investigative steps. It was determined to use someone outside the COD. Graham

also consulted with Dr. Jerry Bauman in the College of Pharmacy and Dr. Joseph Flaherty in the College of Medicine. On October 2, 2006, Dr. Burton Andersen ("Andersen"), a retired UIC professor who held a part-time research advocate position in UIC's Clinical Research Center and an appointment in the Department of Medicine Infection Diseases Section, was selected to further investigate the residents' allegations. Andersen interviewed twenty-two individuals, including all nine of the second, third, and fourth year residents, several OMFS program graduates, certain faculty members, and anesthesiologists. Andersen was provided copies of Graham's and Licari's notes from the September 9 and September 13 meetings, e-mails from the residents, and the August 28 letter. Andersen was asked to evaluate the OMFS Department regarding the appropriateness of resident training.

Andersen did not interview Meer or Heffez as part of his report. On October 10, 2006, Sharon Mistele ("Mistele"), Graham's assistant, contacted Meer to schedule an interview with Andersen. Meer testified that he recalled telling Mistele that he could not do anything without talking to his attorney. Andersen issued his report on October 30, 2006. The report focused on Heffez's actions, but also noted a few complaints and comments about Meer. Andersen concluded that the OMFS residents were "the most dispirited, demoralized, and frightened resident group" he had ever experienced, and noted issues of verbal and physical abuse,

coercion, inappropriate use of probation, and inadequate surgical training and experience.

In January 2007, Graham recommended to Manning and Tanner that Heffez's removal as Department Head be made permanent. In February 2007, Joseph White, the University of Illinois President, approved the recommendation, removing Heffez as Department Head. Graham nominated Sbalchiero to become the permanent Department Head. Meer wrote a letter to Graham stating that he was not in favor of Sbalchiero being appointed permanent Department Head.

Graham attested that, in January 2007, he and Sbalchiero agreed to advise Dr. Sherif Mekhail ("Mekhail") that his appointment with the COD would not be renewed effective August 15, 2007. Graham further attested that they discussed concerns over reports of Mekhail's teaching style being disruptive to the residents. Graham testified that, after Sbalchiero was appointed permanent Department Head in April 2007, they discussed staffing. They felt they wanted to make some changes, and decided not to reappoint Meer and "some other faculty[.]" They "wanted to start with a new environment . . . to start fresh in the program." Around that time, they began to advertise for a Program Director. Sbalchiero testified that he met with Graham to discuss "faculty on the staff[;]" they were "unhappy with the teaching styles, with the interaction with residents."

Graham attested that he and Sbalchiero discussed Meer's

"unacceptable level of leadership and the allegations the residents had made" about him as Program Director. Graham also attested that he considered that Meer "never responded" to the residents' allegations although provided the opportunity to do so in November and December 2006. Graham attested that Meer filing a lawsuit in January 2007 was not considered in the decision not to renew his contract. Sbalchiero also testified that there "was a loss of confidence" in Meer, and he did not answer the allegations against him. On May 2, 2007, written notices of non-renewal were given to Dr. James Vaiana, Dr. Mark Jacob, and Meer reflecting that their appointments with the COD would not be renewed effective August 15, 2007. Graham and Sbalchiero signed the letter to Meer; it was not provided by the Board. Manning did not participate in the decision not to renew Meer's contract. UIC did not offer Meer a terminal contract.

Meer believes that the decision not to renew his contract was retaliation for opposing Sbalchiero's appointment as Department Head. Meer cannot identify any action by Sbalchiero that Meer believes was a form of retaliation. Meer believes that Graham retaliated against him for filing a lawsuit three months earlier, which was "pretty coincidental."

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving

party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

III.

A.Counts I-IV

Counts I through III concern Meer's alleged suspension without due process. Count I alleges that plaintiff has a clear right to "the institution of the proper investigation proceedings and removal procedures prior to" his suspension as set forth in the Statutes. Count II alleges that plaintiff's "suspension without due process constitutes an actual and substantial controversy[,]"

25

and defendants' failed to comply with the procedures set forth in the Statutes. Count III alleges that plaintiff has a clearly ascertainable right in "the institution of the proper investigation and removal procedures prior to" his suspension as set forth in the Statutes. Count IV alleges a violation of procedural due process based on Meer's property interest in his position as Program Director.[12]

Defendants contend that they are entitled to summary judgment on counts I through IV because Meer did not hold a UIC "faculty" position, and therefore was not entitled to the Statutes' severe sanctions procedures. The individual defendants also assert that they are entitled to qualified immunity on counts I, II, and IV. Meer argues that summary judgment should be granted in his favor on counts I, III, and IV because he was "faculty," and therefore entitled to the severe sanctions procedures.

Article II, § 3a(1) of the Statutes provides

The faculty of the University and any of its units except for the Graduate College consists of those members of the academic staff with the rank or title in that unit of professor, associate professor, or assistant professor who are tenured or receiving probationary credit toward tenure, and those administrators in the direct line of responsibility for academic affairs (persons who hold the title director or dean in an academic unit, provost, chancellor and president). Administrative staff members not in the direct line of responsibility for academic

---

[12]I previously concluded that plaintiff sufficiently alleged a constitutionally protected property interest in his position as Program Director based on the Statutes. *Meer*, 524 F. Supp. 2d at 1050-52.

affairs are members of the faculty only if they also hold
faculty appointments.  The bylaws of any academic unit
may further mandate a minimum percent faculty appointment
in that unit for specified faculty privileges, such as
voting privileges.

Article III, § 2b states that, "The faculty of a college shall be
constituted as specified in Article II, Section 3a(1)." Article
IX, § 6a states that, "Severe sanctions other than dismissal for
cause may be imposed on a member of the faculty, as defined in
Article II, Section 3a(1) of the *Statutes* . . . " Article IX, § 6b
lists the minimum required procedures, which are the "exclusive"
means to determine whether to impose severe sanctions. Article IX,
§ 6e defines as "a severe sanction other than dismissal" to include
"suspension with or without salary (full or partial) for a period
not to exceed one-half of the individual's normal appointment
period."

Defendants argue that Meer was not a member of UIC's faculty
because he was not an administrator "in the direct line of
responsibility for academic affairs[,]" and - even if he had been -
he did not suffer a "severe sanction" because he was never
suspended.  Meer argues that he was a member of the faculty (1)
under the Bylaws; (2) as the director of an academic unit; and (3)
as an administrative staff member not in the direct line of
responsibility, based on his Clinical Assistant Professor

appointment[13]. Meer further argues that he suffered a severe sanction because his Program Director and Clinical Assistant Professor duties were "severely curtailed."

Meer acknowledges that the issue is not whether he was considered faculty under the Bylaws,[14] but rather under the Statutes. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 6.) Under the Statutes, faculty is defined as set forth in Article II, § 3a(1). Thus, the question becomes whether Meer qualifies as (1) an administrator in the direct line of responsibility for academic affairs, more specifically whether he holds the title director in an academic unit; or (2) an administrative staff member not in the direct line of responsibility for academic affairs who holds a

---

[13]Plaintiff only argues that he qualifies as faculty as an administrative staff member in opposing summary judgment – not in requesting summary judgment in his favor. (See Pl.'s Mem. in Supp. of Mot. for Summ. J. at 7-13.)

[14]Plaintff also claims that he had "faculty status" under the Statutes because Article II, § 3a(2) of the Statues provides that the Bylaws may "grant specified faculty privileges to members of the academic staff of the unit or of other units who have the rank or title of professor, associate professor, assistant professor, instructor, or lecturer modified by the terms 'research,' 'adjunct,' 'clinical,' 'visiting,' and/or 'emeritus'[.]" (See Pl.'s Mem. in Supp. of Mot. for Summ. J. at 11-13.) First, Article II, § 3a(2) of the Statutes specifically discusses "faculty privileges" – not faculty status. Moreover, plaintiff ignores specific references to Article II, § 3a(1) within the Statutes for the definition of the term faculty, namely: Article III, § 2b's requirement that a college's faculty "shall be constituted as specified in Article II, Section 3a(1)[;]" and Article IX, § 6a's requirement that severe sanctions "may be imposed on a member of the faculty, as defined in Article II, Section 3a(1)[.]"

faculty appointment.[15]

Meer first argues that he is an administrator in the direct line of responsibility for academic affairs holding the title of director in an academic unit.  He asserts that "it is clear that [the COD] is an educational and academic unit[,]" citing Article III, § 2a of the Statutes.  Article III, § 2a only provides that a college "is an educational and administrative group[.]"  Nevertheless, Article III, § 4a suggests that a college is a "unit[,]" and § 4c provides that a school within a college is "an educational and administrative unit composed primarily of academic subunits."  Meer claims that the OMFS residency program is a "subunit" of the OMFS Department because it is "academic in nature[.]"  (See Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J. at 4 n.1; Pl.'s Mem. in Supp. of Mot. for Summ. J. at 8-10.)  The only factual support for this argument is the website's "2008-09" program description.[16]  Moreover, Meer fails to address the Bylaws' definition of the COD's academic units.  It is undisputed that the

_____

[15]It is undisputed that, in 2006 and 2007, plaintiff was neither tenured nor received probationary credit toward tenure. Plaintiff does not argue that he was on the tenure track.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 7.)

[16]Plaintiff's argument relies on citations to the exhibits as opposed to the parties' Local Rule 56.1 statements.  The only facts I have considered on these motions are those properly set forth in the parties Local Rule 56.1 statements.  To the extent that plaintiff also included any facts contained in his briefs in his Local Rule 56.1 statements, I also have not considered any statements of fact that were not properly supported by the citations to the record provided.

Bylaws enumerate the OMFS Department as an academic unit within the COD. It is also undisputed that Meer was not a director or dean of the OMFS Department (nor the other academic units set forth in the Bylaws). Therefore, I conclude that Meer was not faculty under Article II, § 3a(1) based on being an administrator in the direct line of responsibility for academic affairs holding the title of director in an academic unit.

Meer also argues that he is an administrative staff member not in the direct line of responsibility for academic affairs holding a faculty appointment. He contends that the "administrative staff" language in Article II, § 3a(1) of the Statutes "mirrors the language of the [COD] By-laws which references titles such as 'clinical assistant professor' as one holding a faculty appointment."[17] (Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J. at 4.) Meer does not elaborate. The provision in the Bylaws differs from the provision in the Statutes, and Meer does not explain why the Bylaws should control. Also, Graham attested that,

_____

[17] The Bylaws state that, "Administrative staff who are not in the direct line of responsibility for academic affairs are members of the Faculty only if they also hold academic staff appointments as described above." The Bylaws state that members of the COD's academic staff with the unmodified or modified rank or title of assistant professor who are not tenured or receiving probationary credit toward tenure and who hold a salaried appointment of at least 20% time are faculty for purposes of the Bylaws. The Bylaws also provide that certain persons are not COD faculty, including lecturers; research, teaching, and clinical associates; research, teaching, and clinical Assistants; research specialists; and academic professionals.

during 2006 and 2007, Meer "did not hold an appointment as an administrative staff member[,]" which Meer failed to dispute with any citation to the record.  Therefore, I conclude that Meer was not faculty under Article II, § 3a(1) based on being administrative staff holding a faculty appointment.

Because I find that Meer was not faculty under the Statutes, he was not entitled to the procedures for imposing severe sanctions.  As such, I need not determine whether a severe sanction was imposed.  Accordingly, I grant defendants' motion for summary judgment on counts I through IV,[18] and I deny plaintiff's cross-motion for summary judgment on counts I, III, and IV.

B. Count VI

Count VI alleges a violation of equal protection based on the "arbitrary removal" of Meer from his positions and "the rogue nature of the investigation against him," which I previously construed as proceeding under a "class of one" theory.  *See Meer*, 524 F. Supp. 2d at 1053.  A class of one equal protection claim is not available, however, "in the public employment context."[19] *Engquist v. Oregon Dep't of Agric.*, 128 S. Ct. 2146, 2148-49

_____

[18]Because I find no constitutional violation, I need not address the individual defendants' argument that they are entitled to qualified immunity on counts I, II, and IV.

[19]The same is true for count XIII, which similarly alleges a violation of equal protection based on the "arbitrary" termination from and nonrenewal of plaintiff's positions and "the rogue nature of the adverse employment action against him[.]"

(2008).  Therefore, defendants' motion for summary judgment on count VI is granted, and plaintiff's cross-motion for summary judgment on count VI is denied.

## C. Count VII

Count VII alleges retaliatory discharge, claiming that Meer's contract was not renewed because he filed the instant lawsuit, which I previously construed as a First Amendment retaliation claim.  *Meer*, 524 F. Supp. 2d at 1053.  Such a claim is analyzed as follows: first, I must determine whether the employee's speech was constitutionally protected; second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action; and third, the defendant has an opportunity to establish that the same action would have been taken without the employee's protected speech.  *Vukadinovich v. Bd. of Sch. Trs. of N. Newtown Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002).  If plaintiff can establish the first two prongs, then the burden shifts to defendants to prove by a preponderance of the evidence that plaintiff would have been terminated regardless of his protected speech.  *Vukadinovich*, 278 F.3d at 699.  If defendants carry their burden, then plaintiff bears the burden of persuasion to show that defendants' proffered reason was pretextual and that discrimination was the real reason he was fired.  *Id.*  Defendants argue that they are entitled to summary judgment on count VII because Meer has adduced no evidence of retaliation beyond the

temporal proximity of the filing of the lawsuit and the notice of nonrenewal. Meer argues that he is entitled to summary judgment on count VII because he was terminated in retaliation for requesting that he be afforded the procedures set forth in the Statutes and filing this lawsuit.

I already concluded that the speech at issue, namely the filing of the instant lawsuit, was constitutionally protected. *Meer*, 524 F. Supp. 2d at 1053-54. Meer must also establish that the filing of this lawsuit was a substantial or motivating factor in the nonrenewal of his contract. Meer contends that he "was clearly fired as a result of his repeated requests to have the University Statutes enforced and ultimately for his filing of the instant lawsuit." (Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J. at 11.) He argues that it was only after he "filed this lawsuit requesting that the procedures be followed that he received a notification that his position would not be reappointed." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 26.) Meer fails to adduce any evidence that the filing of this lawsuit in any way precipitated the nonrenewal of his contract.[20] All he has shown is that the lawsuit was filed in January 2007 and the nonrenewal letter was sent in May 2007, which is insufficient. *See Smith v.*

---

[20]Also, to the extent plaintiff claims that the decision not to renew his contract was in retaliation for opposing Sbalchiero's appointment as Department Head, plaintiff has not identified any action by Sbalchiero that he believes was a form of retaliation.

*Dunn*, 368 F.3d 705, 708 (7th Cir. 2004) (stating that "[s]uspicious timing" is not enough to establish that speech was motivating factor).

Even assuming, *arguendo*, that Meer had met his burden to establish that the filing of this lawsuit was a substantial or motivating factor in the nonrenewal of his contract, his First Amendment retaliation claim still fails. Meer argues that he "was shown to have been swept into an investigation that truly centered around Dr. Heffez's purported actions." (Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J. at 11; *see also* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 26.) But the facts in the record do not support Meer's argument for pretext because he ignores that the residents also made allegations about his conduct. Therefore, I grant defendants' motion for summary judgment on count VII, and I deny plaintiff's motion for summary judgment for on count VII.

### D. Count V

Count V alleges a violation of substantive due process based on Meer's "property interests in his positions within the [COD] as well as his surgical duties, reputation, and income." To establish a substantive due process claim predicated on a property interest, a plaintiff must show that (1) the state's decision was arbitrary and irrational; and (2) the state committed a separate constitutional violation. *Draghi v. County of Cook*, 184 F.3d 689, 694 (7th Cir. 1999). Defendants argue that they are entitled to

summary judgment on count V because Meer was not deprived of a constitutional right, and the actions taken did not shock the conscience. The individual defendants also assert that they are entitled to qualified immunity on this count. Meer argues that he is entitled to summary judgment on count V because his removal was arbitrary and irrational.

As explained above, Meer has not shown that defendants committed an independent constitutional violation. *See Draghi*, 184 F.3d at 694-95. Even assuming, *arguendo*, that Meer could establish a separate constitutional violation, he still has not shown that the decision to remove him from his Program Director duties was arbitrary and irrational. Meer argues that he was "lump[ed]" in with Heffez's actions, Heffez was "the subject of the entire scope of the residents' complaints[,]" and Heffez "supervised and controlled" him. (Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J. at 6-7; *see* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 17-21.) Again, Meer disregards that allegations were made about him. Therefore, defendants' motion for summary judgment on count V is granted,[21] and plaintiff's motion for summary judgment on count V is denied.

### E. Counts VIII-XIII

Counts VIII through XIII, labeled "In the Alternative," are

---

[21]Because I find no constitutional violation, I need not address the individual defendants' argument that they are entitled to qualified immunity on count V.

predicated on Meer's allegations that Article IX, § 11 applies such that he was entitled to more than three months notice of the nonrenewal of his contract. Defendants argue that they are entitled to summary judgment on these claims related to the nonrenewal of Meer's contract based on the failure to provide twelve months notice because no such notice was required. The individual defendants also assert that they are entitled to qualified immunity on these counts. Meer does not respond. Moreover, defendants cite Meer's deposition testimony that, although he originally believed he was entitled to more than three months notice, he no longer does based on his designation of clinical assistant professor.[22] Therefore, I grant defendant's motion for summary judgment on counts VIII through XIII.[23]

IV.

For the reasons set forth above, defendants' motion for summary judgment on all counts is granted, and plaintiff's cross-motion for summary judgment on counts I and III through VII is denied.

_____

[22]Defendants cite to the exhibit rather than the Rule 56.1 statement.

[23]As such, I need not address the individual defendants' argument that they are entitled to qualified immunity on counts VIII and XI through XIII.

**ENTER ORDER:**

_Elaine E. Bucklo_
_____

**Elaine E. Bucklo**
United States District Judge

Dated:     April 29, 2009